UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------
In re

    Thomas F. Klem                                    Case No. 05-18463 K

                       Debtor
------------------------------------------------------------------
Offermann Cassano Greco Slisz & Adams LLP

                     Plaintiff

        -vs-                           AP No. 05-1314 K

Thomas F. Klem

                     Defendant
------------------------------------------------------------------


Charles Messina, Esq.
Offermann, Cassano, Greco, Slisz & Adams, LLP
1776 Statler Towers
Buffalo, NY   14202

Attorney for Plaintiff


Regina A. Walker, Esq.
Jeffrey Freedman Attorneys at Law
424 Main Street, Suite 622
Buffalo, NY   14202-3593

Attorney for Defendant


<u>OPINION AND ORDER</u>

      This is a pre-BAPCPA case involving obligations resulting from a marital

dissolution.  Consequently, the difference between "alimony, maintenance and support," on the

one hand, and "property settlement," on the other, may be dispositive of the issue of 11 U.S.C.

§ 523(a) dischargeability.

Specifically, the Debtor was ordered by the matrimonial court to pay $17,000 of his wife's attorney's fees. Importantly, that court eventually ordered only <u>child</u> support - - which obligation the Debtor has never failed to perform - - and not spousal support. The former wife's law firm, suing in its own name under *In re Spong*, 661 F.2d 6, 9 (2d Cir. 1981)[1] argues that the award of attorneys fees against the Debtor was "in the nature of support" of itself, despite no actual award of "support payments" to the former wife, and is *per se* nondischargeable under § 523(a)(5).

In the alternative, the firm argues, under pre-BAPCPA 11 U.S.C. § 523(a)(15), that the benefit to the Debtor that would result from discharge of the $17,000 obligation does <u>not</u> outweigh the detriment to the former spouse; i.e., he can better afford to pay it than she. (As to the Gordian's Knot of views regarding burden shifting under former 11 U.S.C. § 523(a)(15), see the very capable analyses at *In re Moeder*, 220 B.R. 52, 55-56 (8th Cir. B.A.P. 1998) (Koger, C.J.) (analyzing and determining initial burden of creditor and then shifting of burden to debtor); *accord in re Fellner*, 256 B.R. 898 (8th Cir. B.A.P. 2001) (Koger, C.J.).

The matter was tried to the Court on October 25, 2006, and November 8, 2006.

As the Court stated at close of trial, the decision in this case turns on the sufficiency of the evidence. But whose evidence? Whose burden? And in this regard, it is important that various discovery defalcations by the Debtor resulted, on October 3, 2006, in a

---

[1] In an interesting twist, the former spouse has herself hired the firm to pursue this 11 U.S.C. § 523, hoping that if the firm prevails on the merits, this Court will also apply *In re Behn*, 242 B.R. 229 (Bankr. W.D.N.Y. 1999) to add these new fees to the non-dischargeable judgment.

preclusion order that stated:

> In light of the difficulty of quantifying, being able to quantify the part of the addendum of the complaint that is clearly non-dischargeable under 523(a)(5), I think it makes sense for me to take the summary judgment motion under submission, order a hearing under 523(a)(15), at which Karen Klem may offer up a prima facie case to combat the balancing test aspect.

> Certainly, if the debtor wishes to, through counsel, cross-examine through counsel, I don't think he can be precluded from doing that. But he certainly would be precluded from offering any rebuttal that isn't limited to the materials that he did provide in response to discovery.

> As to 523(a)(15), sub A he can, if he wishes, to offer his own testimony as to how he can't afford to meet these obligations, but he cannot - - he's precluded from supporting, though, that with documentary evidence or with testimony of others to support his - - his own testimony. He can offer his pay stub and tax return, which was provided in discovery.

> [A]ll of what I just said is so ordered.

(Transcript October 3, 2006, 21-22).

The § 523(a)(5) Argument

After examining the two matrimonial court awards of fees (one for $12,000 and the other for $5,000), it is clear that the § 523(a)(5) argument must fail, in this case.

The governing state statute is N.Y. Domestic Relations Law § 237. The highest court of this State, in 1987, observed that when the legislature replaced § 237's predecessor, it "significantly" deleted a word that would be essential to the firm's argument. The statute changed from permitting an award of fees that are "necessary to enable the wife to carry on or defend the [matrimonial] action," to permitting an award "to enable the wife . . ." *DeCabrera v.*

*Carbrera-Rosete*, 70 N.Y. 2d 879 (1987).  The State's High Court said, "This omission left the courts with flexibility . . . .  Indigency is not a prerequisite to an award of counsel fees." Financial circumstances became only one factor, along with "the relative merit of the parties' positions," and, as later cases made clear, "liquidity of the marital property . . . and the parties' relative earning power . . ." *Madori v. Madori*, 201 A.D. 2d 859 (N.Y. App. Div. 1994), and "obstructionist or dilatory tactics" (*Love v. Love*, 250 A.D. 2d 739) (N.Y. App. Div. 1998).

All three of the above cases were cited in the matrimonial Order of December 21, 2004, awarding fees of $12,000, and this Court deems the subsequent award of $5000 to have been similarly based.

This Court concludes that it cannot be said that the fee awards were "in the nature of [spousal] support," for purposes of § 523(a)(5).

## The 11 U.S.C. § 523(a)(15) Argument

To address the § 523(a)(15) issue, the Court must begin with Rule 52 Findings of Fact.

## FACTS OF THE MATRIMONIAL PROCEEDING

1.  Mrs. Klem sued the Debtor for divorce in Spring of 2001.

2.  Both Mrs. Klem and the Debtor initially had legal counsel.

3.  There are two children of the marriage, and the Debtor's payment of child support is not at issue in this case, except to the extent that some small portion of the attorney's

fees at issue might be attributable to the child support element of the matrimonial proceeding.

The Debtor has always been current with his child support payments.

       4.  In the Spring of 2002, Mrs. Klem's present counsel substituted in for a

previous attorney.  And present counsel then had fifteen to twenty conferences with the Debtor's

counsel.

       5.  By February of 2003, the Debtor's counsel had to withdraw from the

matrimonial proceeding, with approval of the court, because the initial $2,000 retainer had been

used up, and the Debtor had fallen into arrears to his counsel in an amount in excess of $5,000.

The Debtor thereafter proceeded *pro se*.

       6.  The Debtor stopped voluntary cooperation in connection with preparations for

trial of the matrimonial matter before a matrimonial referee.  Mrs. Klem's counsel had to

subpoena everything.

       7.  At hearing before the referee on June 29 and 30 of the year 2004, and pursuant

to the subpoenaed materials, Mrs. Klem's counsel sought division of property, spousal support,

child support, disposition of 401K accounts, disposition of IRA accounts, disposition of vehicles,

and insurance, and pertinent Qualified Domestic Relations Orders.

       8.  Though counsel testified at hearing before the present Court that between 45%

and 65% of his billings to his clients related in some way to efforts to obtain child support and

spousal support, the matrimonial referee did not  recommend any spousal support.  This is not to

say that the report denied spousal support; it was silent on that issue.

9.  On October 25, 2004, the matrimonial court confirmed the referee's report.

10.  However, while the court had the referee's report under submission, Mrs. Klem's attorney made application to the court seeking an order directing the Debtor to pay Mrs. Klem's outstanding attorney's fees in the amount of nearly $25,000 (of which she had already paid $5800).

11.  On December 20, 2004, the matrimonial court ordered the Debtor to pay to Mrs. Klem $12,000 toward her legal fees.  Among the factors the Court cited was a "disparity of income," but the Court also cited "obstructionist tactics and the overall equitable award," stating the following: "a review of this case supports the allegation that [the Debtor's] action and the actions of his prior counsel unnecessarily extended this litigation.  More importantly, the wasteful dissipation of the parties' assets by the [Debtor] contributed to additional litigation costs being borne by [Mrs. Klem] while Defendant represented himself.  Payment arrangements should be made directly with [counsel] within 30 days of the date of this order or [counsel] may make an *ex parte* application to this Court for any unpaid sum."

12.  By May of 2005, the Debtor had not fulfilled his obligations under the matrimonial court's original decree or the attorney's fee order.  The matrimonial court found the Debtor to be in contempt of court, imposed a civil fine, issued further orders, and threatened arrest and a prison term.  It further ordered that Mr. Klem's counsel be awarded further attorney's fees of $5,000 for the bringing of the enforcement order.

13.  Final orders were entered upon the contempt finding in June of 2005, and an order and judgment for the second attorney's award was entered in July.

14.  The Debtor filed for Chapter 7 relief in September of 2005, having paid only $ 3,343.70 of the total $17,000 attorney's fee obligation.

15.  Mrs. Klem's counsel commenced this dischargeability action shortly thereafter; the Debtor answered through his bankruptcy counsel in November of 2005, and the initial pre-trial of the matter was conducted on December 6, 2005.

16.  Thereafter, the Debtor failed to produce discovery, necessitating the filing of a "Motion for Summary Judgment and other relief," by Mrs. Klem's counsel on July 20, 2006.

17.  This Court granted a preclusion order in response to that motion and set the matter down for trial.  Because of his failure to produce discovery materials, the Debtor was precluded from offering any documentary evidence and any testimony by any witnesses other than himself regarding his financial condition at the time of trial.

18.  The matter was tried on two disconnected days, the parties resting on November 8, 2006.

18.5 Mrs. Klem has no disabilities.

19.  Closing arguments were heard on December 13, 2006.


FINDINGS REGARDING MRS. KLEM'S FINANCIAL CONDITION
AT THE TIME OF TRIAL


20.  The children of the marriage, now ages 20 and 18 have lived with their mother throughout the relevant period.

21.  They live in a house that Mrs. Klem inherited.  It is assessed at $125,000 value, and is not encumbered by a mortgage.

22.  Mrs. Klem has two siblings.  Their father died in 1997 and their mother in 1999.

23.  Although the testimony is not clear, and although the parents' wills were not produced, it appears that there were other assets in the parents' estates, which assets are administered by Mrs. Klem's brother and his wife (who is an out-of-state attorney).   Mrs. Klem has borrowed from those estates to maintain her home, "owes thousands" to the estates, knows almost nothing about what is in the estates, and trusts to her brother and sister-in-law to maintain the various debits and credits on her behalf.  The Court has no idea of the value of Mrs. Klem's interest in the remaining decedents' estates.

24.  Mrs. Klem works part-time (20-25 hours per week) at the Buffalo News and accepts whatever additional hours she is offered.

25.  She drives a 1999 Ford Explorer that she received from the divorce.

26.  In addition to the house, she received $60,000 from the proceeds of her parents' IRA's, received $60,000 from the Debtor's IRA's in the divorce, and has a retirement account of her own of $6,000.  She thus has over $100,000 in retirement savings.  Mrs. Klem also has between $6,000 and $7,000 in a certificate of deposit left from her one-third share of the $120,000 proceeds of other property at 102 Farber Lane.  The details of this matter are not clear. It appears that that had been the marital residence before Mrs. Klem left that household shortly

after her mother died in 1999. She testifies that it is from that original amount of $39,000 that she has been repaying loans to her parents' estates, and that the rest of that money has gone to everyday bills and expenses.

27. She at the time of trial had less than $200 in her checking account and less than $100 in her savings account.

28. The parties' daughter commutes to college and works part-time at a donut shop.

29. The parties' son does not go to school and works 20 to 25 hours per week as a bus boy in a restaurant.

30. Mrs. Klem has a Bachelor's Degree in Education, and has regularly looked for full-time employment in graphic design.

31. Mrs. Klem has health insurance through her employment at the Buffalo News.

32. She has a live-in boyfriend who contributes $100 per week for food and other essentials, and, because he is a self-employed carpenter, does maintenance, lawn care, repairs, etc., on the house.

33. The Ford Explorer has 140,000 miles on it, needs a transmission, brakes and tires. She had to buy a Jeep from a neighbor when the Explorer was inoperable. She sold the Jeep for $2900 in the summer of 2005, and used those proceeds to pay property taxes, utilities, and charge cards. Similarly, she had inherited a 1994 Chevrolet Caprice that had belonged to her

father, which she sold in the summer of 2006 for $2400, which money went to pay bills and additional property taxes.

34. Her current home was built in 1926, and she has had to make a number of repairs, borrowing from "the estate." In connection with one repair around the garage, she added a small patio, toward which her live-in boyfriend paid $1500.

35. She bought two area rugs within the month preceding trial, totaling approximately $400.

36. In the year 2005, she took the children on a $3,000 cruise, for which she had saved from tax refunds, etc. for a period of five years, by her testimony.

37. She is unable currently to pay bills on time, by her testimony, and has been so unable for "quite a while now," borrowing from "the estate" and using charge cards. She cannot afford a new car, would need thousands of additional dollars to attend completely to the electrical, plumbing, roof, heating, and other needs of her house. And if she had to make payments to her attorneys on the amount that the Debtor was ordered to pay, she would not be able to afford it, by her testimony.

38. All of the attorney's fees and expenses for the present dischargeability litigation are being billed to her, pursuant to a Retainer Agreement that was specifically for purposes of this dischargeability proceeding; consequently, on the basis of such authorities as *In re Behn*, *supra* n.1 the law firm seeks not only the original $17,000 awarded to them by the matrimonial court (less payments made by the Debtor), but also an award of all attorney's fees

incident to this dischargeability litigation in the amount of $ 7,348.73.


### THE DEBTOR'S TESTIMONY REGARDING
### FINANCIAL CONDITION AT THE TIME OF TRIAL[2]

39.  Mr. Klem is 50 years old and has no disabilities.

40.  He has a Bachelor's Degree in Business and an Associate's Degree in Business Administration.

41.  For 20 years, until 2000, he had been a Purchasing Agent, making $35,000 in the year 2000.

42.  Shortly after Mrs. Klem left the marital home in January of 2000, the Debtor stopped working at a company for which he had worked for 14 years.  Mrs. Klem asserts that he chose to lose his job by refusing to carry a "pager."  Mr. Klem asserts he was laid off.

43.  After 26 weeks of unemployment he took a job with a temporary services company, was placed at Harlequin Publishing and then went to work for Harlequin Publishing in August of 2001.  His current hourly wage is $11.16.

44.  For tax year 2003 he reported $24,500 in gross income, for tax year 2004 he reported $31,051 in gross income, and for tax year 2005, he reported $29,300 in gross income (the reduction resulting from lack of overtime).

---

[2]For reasons to be explained later, these are not all "Findings of Fact."

45.  He testifies that he lives with his father and stepmother in his father's house, which, however is apparently titled to the Debtor's sister-in-law, and discussed later.

46.  From average weekly take-home pay of $400, he pays $141 for child support. He also asserts that he pays $100 to his father and stepmother, and spends $45 on gasoline, and that he additionally buys his own food and vehicle repairs, although he owns no vehicle, having regular use of a vehicle owned by his father.

47.  He states that he is regularly looking for jobs in purchasing.

48.  In the past he has done pizza delivery for cash, but he states that he is not currently working "under the table."

49.  He states that he pays $20 per week to maintain a storage shed for the furniture, documents and clothes that he got from the divorce.  In addition, he has two shotguns. He has about $15,000 in retirement, but has no other savings.  He asserts that he takes no vacations, and has no other assets.  The IRA was the source of funds for the payment of his current lawyer.

50.  He has been discharged of his other $20,000 in debt.

51.  His annual raises at Harlequin are $.25 per hour.

52.  His job at Harlequin is as a forklift operator.

53.  His only clothes are casual, he does his own laundry, and occasionally has a dry cleaning expense for a jacket or sweater.

54.  He states that he spends only $100 a month for recreation, including an occasional restaurant meal with his children.

55. There is some confusion regarding his father's home. It was apparently purchased by his sister-in-law, but the Debtor was the <u>grantor</u> to the sister-in-law in December of 2001. He explained that when his mother was dying, and his brother had already passed away, his mother transferred it to him, but that it was always to be his father's. The testimony in that regard was brief and not vigorously pursued by the Plaintiff. However, the Plaintiff wishes the Court to consider this transaction is connection with other facts that the Plaintiff seeks to raise as signifying either hidden assets or as intentional disposition of assets. The Debtor admits that he did have a coin collection, which he sold off at various shows for a few thousand dollars. He admits that he was a gambler seven to ten years ago, but asserts that he is not a gambler now. In the year 2000, he had $140,000 in retirement funds, but now has only $15,000. And as noted above, he has worked "under the table before." These will be discussed below.

56. As to the proceedings that led to the $17,000 worth of attorney's fee awards against him, he attests that he had never contested the divorce and fought only about the division of property, and that he felt misled by the referee who (the Debtor says) had said that both sides would pay their own attorney's fees. He testified that he did not understand the application process by which the firm sought the award of attorney's fees, and so did not defend those applications.

<u>ANALYSIS</u>

As stated earlier, sorting out the various burdens "of going forward" under 11 U.S.C. § 523(a)(15) as it appeared prior to October 17, 2005 is to solve a Gordian's Knot. And

the balancing test itself, as a substantive matter, is highly problematic in New York, where a wage execution for a money judgment is limited to 10%. In some other states, wage execution on matrimonial obligations can be as high as 50%.

But the Court is satisfied that it is the Debtor who must prove, by a fair preponderance of the evidence, that either (1) he cannot afford to pay, or (2) he can, but the benefit to him of discharging the debt would not be outweighed by the detriment to Mrs. Klem.

The Court finds that having stonewalled discovery, the Debtor's self-serving testimony at trial, standing alone, lacks sufficient weight to carry the burden.

This is not a "per se" rule, or a rule of broad application to all civil actions. Rather, it is particular to the facts of this case. There are no fewer than six significant, material events/activities that could have and should have been addressed in detail, and documented by the Debtor, before he could be said to carry his burden, all of which emerged on cross-examination.

1. The fact that the Debtor earned significantly more money as a purchasing agent until he "lost" the better-paying job (after 14 years) in the midst of the dissolution of the marriage. He then took 26 weeks of unemployment, and then became a hired "temp" driving a fork lift.

2. He dissipated a valuable coin collection by selling it off at flea markets for "a few thousand dollars."

3. He once held title to "his father's" house. He explains only that it had been his mother's house; she deeded it to him on her death bed, on the understanding that it would be his

father's house; he promptly re-deeded it to his sister-in-law.

4. The exact relationship between the Debtor and his father, financially, is told only by the Debtor. It is thus mere "speculation" that any paternal "grace" is present at all.

5. The Debtor had over $140,000 in retirement accounts in 2000, now down to $15,000. Documents to support the Debtor's testimony about the draw down were never produced before trial, and were precluded at trial.

6. The Debtor "used to be" a gambler.

If all of these event/activities were proven harmless, then it would be the Court's view that the phrase "necessary expenses" as used in former § 523(a)(15) does not mean "actual expenses" when a debtor's actual expenses are less than what would be "necessary" absent substantial family assistance. A contrary ruling would turn the assistance the family extends to the debtor, into assistance extended to the debtor's former spouse.

Consider this hypothetical. Presume that the Debtor's father does not live in this region, and so the Debtor lives in a $650/mo. apartment, makes payments on an economy car and must pay all of the other carrying costs of the car (insurance, maintenance, repairs, etc.), buys all of his own food and other essentials, and has all of the other "reasonably necessary" expenses of living alone. Let us total those expenses at, say, $1500/mo. Then presume that the Debtor's father has sufficient means to send him $500/mo. to help him out, and does so without fail. This Court would not hold, for purposes of § 523(a)(15)(A), that the Debtor's "necessary expenses" are only $1000/mo. His necessary expenses would be $1500/mo. and the $500 from his father is not "income."

This case would be no different.  If the Court accepted the Debtor's testimony as fact, then the Debtor is fortunate that (1) he still has a father, (2) who lives here, (3) who is willing to take him in, and (4) can afford to waive fair rent, car carrying-costs, etc.  That good fortune for the Debtor would not be the former spouse's entitlement.  And it would become an entitlement if the dollar value of that grace were to make the difference in a § 523(a)(15)(A) determination.  Thus, that statute may not be construed as the Plaintiff requests.

In the Court's hypothetical, the dollar amount of the grace is $500 per month and the Debtor's "necessary expenses" are whatever they are.  In the case at Bar, we cannot compute the dollar amount of fatherly grace.  But we need not do so, if the Debtor's testimony is taken at face value.  The Debtor earned about $29,000 last year.  From a monthly gross pay of about $2,400, $606 per month went to child support payments, leaving $1,794.  Ordinary payroll deductions were approximately $600 per month, leaving $1,194 per month.  Additionally, $154 per month went to an IRS garnishment arising out of an audit for 2002 or 2003, leaving $1,040 per week.  He contributed $103 to his retirement account, leaving $937.  He paid $100 per week to his father for rent and usage of the car, leaving about $525 per month. Sixty-five dollars per month went to the storage unit, leaving $460 monthly.  Gasoline for the car is $175 and food is $300 per month, leaving only a pro-rated tax refund of about $30 per month for everything else, such as uninsured medical/dental expenses, recreation, clothing, dry cleaning, etc.

All that said, the Debtor's testimony cannot be taken at face value.

### THE PRECLUSION ORDER, AND THE
### BURDEN OF PROOF

There was extensive argument and colloquy before the Court on October 3, 2006. The Transcript is part of the Clerk's file. At that hearing the Court, among other things, took the Plaintiff's Summary Judgment Motion (based, among other things on non-production of discovery materials) under submission, ordered preclusion, and set the matter down for trial.

The preclusion that was granted was exactly what the Plaintiff requested - - "Precluding the Debtor . . . from offering any evidence at the time of trial which has been demanded in Plaintiff's Discovery Demands but which has not been produced to date [July 21, 2006]." It is this preclusion that is fatal to the Debtor's case here. Not because the Court does not believe the Debtor's testimony - - it is a plausible tale - - but because after that date, and particularly at trial, the Plaintiff had to prosecute this action with one hand tied behind its back. It had no opportunity to know precisely what details the Debtor would offer, and no means to attack them.[3] At hearing on October 3, 2006, the Court expressed doubt that the Debtor could carry the initial burden of proof, given what was precluded. (Transcript p. 20)

What this writer was expressing at that time is this: given Judge Koger's fine analysis of the shifting burdens under 11 U.S.C. § 523(a)(15), it was not required that the

---

[3]To depose the Debtor after seeking preclusion on July 21, 2006, and before trial, would have required more expense, with nothing to be gained, given that the Plaintiff had not received the discovery materials.

Plaintiff, as part of its case-in-chief, prove that the Debtor <u>could</u> afford at least a 10% wage

garnishment toward payment of these fee awards.  If it were so required, then the Plaintiff would

have requested, and the Court would have granted, an Order stating that Plaintiff would have the

benefit of all reasonable "adverse inferences" that arise from the Debtor's failure to produce

discovery materials, in the Plaintiff's efforts (at trial) to make out a *prima facie* case-in-chief.

      Instead, it was the Debtor's burden to satisfy the Court, by some adequate

quantum of proof, that he could not afford to pay the fee awards.  Only then would the burden of

going forward shift to the Plaintiff, and the Plaintiff would then have the ultimate burden of

proof by   a "fair preponderance of the evidence."

      The question, then is whether the testimony of the Debtor alone, obviously self-

serving, suffices to shift to the Plaintiff the burden of going forward to defeat the Debtor's

defenses <u>both</u> under (A) and (B) of § 523(a)(15).

      In this case, this is an extraordinarily difficult and close question.  We are not

talking about sophisticated business or investment records.  We are talking about simple weekly

income and expenses.

      But a failure to produce discovery materials is not simply about preparation for

trial.  It is also about whether to drop the matter, or to settle, rather than proceeding to trial.  It is

one thing for parties to <u>agree</u> to go to trial without discovery, make the record, and take it from

there.  It is another thing entirely for one party to stonewall discovery demands and hope to

prevail anyway.

The Court is reminded of a dissimilar case, with a similar substantive outcome. The cause of action was an alleged fraudulent transfer of a house by the debtor to her daughter. The debtor attested, in discovery responses, that the daughter handled all of her personal finances, and the daughter attested, in discovery responses, that the debtor was solvent at all material times.

At trial, however, their stories changed. The defendant/daughter testified that she never handled her mother's finances and that her previous attestation was only "upon information and belief." And the debtor/mother testified that she suffers from mental infirmities; must have been hallucinating when she told the earlier story under oath; and that she can't remember anything about her finances, because of her infirmities. The plaintiff/trustee, utterly surprised, had been totally flummoxed in attempting to prove the insolvency element of his case-in-chief by means of the personal knowledge of the daughter. Defendant's counsel had no explanation for having failed to supplement the discovery responses prior to trial. The Court invited, and granted, a motion for judgment on the pleadings as a sanction for vexatious litigation tactics.

Here, the Debtor simply stonewalled discovery and came to trial with a self-serving story that the Plaintiff had no means to probe. The Court has examined the Discovery Demands. Fairly viewed, with hindsight in light of the Debtor's trial testimony, the Debtor should have produced either cancelled checks or other documentary evidence, or affidavits of his father, to prove his actual expenses for rent, car expenses, storage expenses, food, etc. And complete and honest responses might have disclosed that in fact the Debtor does not pay

$100/week to his father for rent and for use of the car. Complete and honest responses might had

disclosed the existence of a new credit card, and follow-up might have disclosed luxury activities

or purchases by the Debtor. Complete and honest responses may have produced bank statements

with unusual and unexplained transactions.

It is the very purpose of discovery between parties to avoid the expense of casting

a "broad net" of third-party discovery to explore such things, for better or for worse for one's

case. And in the vast, vast majority of cases, complete and honest responses to discovery

demands lead to settlements, voluntary dismissals, or consents to adverse judgments. Student

loan "undue hardship" cases and "credit card abuse" dischargeability cases head the list of

Adversary Proceedings that almost never go to trial.

Although matrimonial disputes are harder, the principles and purposes and

importance of the discovery rules are no different.

In this case, if honest and complete discovery responses had been provided many

months ago, and if they were consistent with the Debtor's current testimony, then one of three

things are likely to have occurred: (1) settlement at some modest monthly payment to the

Plaintiff for some period of years; (2) voluntary dismissal of the Adversary Proceeding, or (3) a

stipulation to submit only the § 523(a)(5) dispute for a decision on the law. Any one of these

would have necessitated far, far less expenditure of emotion, energy, and expenses.

That precisely is the function and intendment of the Rules. See F.R.Civ.P. Rule

1.

CONCLUSION

If Plaintiff's July 21, 2006 Motion for Summary Judgment had been based upon

11 U.S.C. § 523(a)(15) as well as § 523(a)(5), this Court would grant it now that a complete

record has been made at trial.  It would do so having observed the obstacles facing the Plaintiff

at trial, given the Debtor's defalcations of discovery.  But the Motion denied the applicability of

§ 523(a)(15), and so the Court, having dismissed the § 523(a)(5) cause of action, rules only on

the admissible evidence presented at trial on the § 523(a)(15) cause of action, and finds that the

sufficiency of the Debtor's evidence fails to shift the burden of going forward to the Plaintiff.

If the Debtor had produced discovery materials and if they were consistent with

his testimony at trial, and if the Plaintiff had been unable to attack those materials, and if this

dispute were not to have been dropped or settled and instead proceeded to the trial that was had,

the Debtor would have prevailed.  That is why this case presents such a close question.

Furthermore, if all of the "ifs" above were in the Debtor's favor but <u>even</u> if the

Court were to have ruled against the Debtor on the sufficiency of the evidence, this Court would

have found *In re Behn* inapplicable, and would have denied attorney's fees for <u>this</u> Adversary

Proceeding - - the Debtor would not have been required to concede the non-dischargeability of

the debt to the Plaintiff. [4]

    The Clerk shall enter Judgment as follows:  The unpaid portion of the $17,000 in fee awards is not discharged; and money judgment is further ordered in the amount of $ 7348.73 for Plaintiff's billings to Mrs. Klem in connection with this Adversary Proceeding.[5]

    SO ORDERED.

Dated:  Buffalo, New York
    February 6, 2007

              s/Michael J. Kaplan

           _____
               U.S.B.J.

---

[4]Even as it is, this Court is not convinced that such attorney's fees would be allowable as a non-dischargeable debt.  The District Court's decision in *In re Lutgen* was based on a contractual liability for collection fees and costs, and *In re Behn* was based on the findings of pre-bankruptcy courts that were functionally identical to the provisions of 11 U.S.C. § 523(a)(6).  Were it not that this Plaintiff's reliance on 11 U.S.C. §523(a)(5) has been rejected, *Behn* might have applied.  But § 523(a)(15) was a unique, federal law.

[5]In a different case it might be important that when a law firm is the plaintiff, it should be the *quantum meruit* value of the services that would be awarded, not the rate at which the firm would bill a hypothetical client.  But here Mrs. Klem seems to be the true party-plaintiff, though not in name.  If the Retainer Agreement by which she agreed to pay the firm to enforce the fee award is actually a "sham," the Court has no evidence of it.